Dated 30 May 2025

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

FILED TPA INTAKE USBC
3 JUN 2025 PM3:58

In re:
Ally Alica Dzelilovic,

Case No. 8:23-bk-05872-RCT
Chapter 13

Debtor.
_____/

**MOTION TO ALLOW TRUSTEE RETRIEVAL/ENFORCEMENT ACTION IN SEVERANCE PAY GARNISHMENT AND CLAIMS REVIEW**

Debtor files this Motion upon feedback received from Standing Trustee, Kelly Remick [Exhibit 1] that Debtor should seek Court approval for any action of the U.S. Trustee related to wage garnishment in reference to BCS, LLC and Lindahl Reed Inc. Further pursuant to duties and obligations of Standing Trustees, Debtor seeks Court approval that the Standing Trustee reviews and performs **objections as appropriate**, to unsecured creditor claims filed under the Debtor's Plan, by working with Debtor to reconcile the validity of each unsecured claim.

As noted in the Trustee's Amended Objection to Confirmation, all claims owed to the Debtor must be placed in Trust. Both employers are government contractors, where Department of Labor, OFCCP, EEOC laws would apply and have jurisdiction in matters of civil violations such as non-payment of benefits, salary, medical leave, and other financial, or safety obligations by employers. Therefore the DOJ would have jurisdiction in actions for the retrieval of unpaid benefits.

A critical component of the "USTP's mission is to ensure that all participants who comply with the Bankruptcy Code's requirements <u>**receive the relief that the law affords them,**</u> [...] and the navigating procedural obstacles to a fresh start." [US Trustee Program Manual and Policies, Vol. 4, 18 February 2025]. The law authorizes the U.S. Trustee to garnish wages where appropriate to pay creditors. In her case, 23-05872, Debtor disclosed unpaid severance voluntarily upon initial bankruptcy filings, If the Court allowed Debtor's motion to work with the U.S. Trustee to retrieve

unpaid severance pay, which would have been one month severance pay for BCS LLC (~$5,556), and one month severance pay for Lindahl Reed (~$7,205.1). The total owed to Debtor (not including violations of Title VII law, violations of DOL FEMLA, OFCCP violations by the contractors which could include backpay), is around **$ 12,860.**

**Background information on former employers:**

Debtor suffered from overwork and a health concern in September 2022 when BCS LLC HR office abruptly discontinued employment and wrote in an email it would deliver a one month severance to the employee. Debtor was medically injured and returned equipment, but the Human Resource officers (Zimmerman), Executive Office (Kiana, Secretary) ignored the severance pay request directing an outside contracted consultant (Heather Albareno) to deter severance pay requests of an injured consultant fired on medical leave in violation of OFCCP and DOL laws. Between October 2022 - June 2023, Debtor attempted to, but was unsuccessful at, getting the severance pay which would have helped Debtor at the time **cure mortgage and other bill arrearages**, while employer refused to respond(evidence for DOJ/Trustee). On multiple instances, Debtor called and went directly to the company CEO to ask for the severance and the employer still wouldn't pay the severance. Debtor filed a complaint with the OFCCP, the EEOC, and the Tampa Office investigated the employer reviewing the evidence provided by Debtor and found the employer liable for an EEOC violation on disparate impact, discriminatory termination and non-payment of the severance (Exhibit 1). Debtor intended to, but was unable for medical reasons, to undergo the barriers to successful execution of the filing of a court lawsuit in a Court of law, as per multiple reasons. Debtor sought legal help but was provided run-around by attorneys and conflicting information and was not able to find an attorney specialized enough who can help Debtor identify which Court of law has jurisdiction to sue employer BCS, LLC multiple headquarters and remote employees in different states due to COVID provisions. Debtor met in-

person the management and administrative/HR staff at a company retreat in June 2024. The EEOC Office cross-filed the claim with the Florida Commission on Human Relations, but the Commission didn't further investigate this issue due to the volume of other claims and small amount of claims. The debtor did not have the health, means, or sufficient legal infrastructure to pursue a legal claim despite following up **for a year** on the severance pay and disclosing in writing the severance pay is needed for essential bills such as mortgage arrearages, so the employer does not misinterpret use of severance funds based on discrimination or bias as per EEOC investigation (EEOC Charge 511-2023-01141). As none of the attorneys in Florida the Debtor consulted at the time could identify the appropriate court to put a financial claim in, Debtor motions the Middle Bankruptcy Court to allow U.S. Trustee Region 21, to support retrieving severance pay to further bankruptcy payments as Standing Trustee has insufficient reach. Those benefits would then all go back to the Trust to disburse to creditors as the Debtor had articulated the intention of the use of those funds to employers previously. Debtor does not have the ability to, on her own, retrieve this without the help of the Department of Justice, or the DOJ Trustee. Many attorneys who looked at this claim declined representation as they alleged it represents a small amount of money to recover in light of the legal effort they would need to put forth.

**Previous Discrimination:**

In 2016, Debtor also filed an EEOC complaint against National Association of Regulatory Commissioners (NARUC)'s Office of International Programs as Debtor was a Senior Program Officer performing work for USAID as a client. At the time, Debtor was exposed to discriminatory work practices by mainly women (Hammel, Godfrey) and USAID African-American female client told Debtor to get together with people of her kind "to drink vodka and eat potatoes" after which the International Program Office discontinued the employment of debtor due to her racial/ethnic background and disability reasons. The debtor sought and paid for attorney services but received

insufficient support to obtain wages owed back from NARUC. Yet, at the time, Debtor recovered financially somewhat with another job but no financial recovery was obtained from the above employer for discrimination after the EEOC charge was filed. In 2019, Debtor onboarded a job with the City of St Pete Beach, a government employer, where Debtor was hired at a grade and position below qualifications and education. Working in 2021 with the Florida Department of Unemployment, on a discrimination claim, Debtor disclosed the reasons for having to leave the job were partially discriminatory as the City Manager hired other staff (female, M. Gonzalez) with the same education and experience as Debtor to oversee her, hired at three grades above and three times higher salary than Debtor, demonstrating instances of disparate and discriminatory treatment in pay and grade. When discrimination in the workplace results in financial injury (paying someone less, withholding benefits or escaping financial liability because of who they are or prejudice or bias against them, false claims against their background).

### Lindahl Reed Inc.

Informed by non-payment of the severance by BCS LLC, Debtor hired private Counsel and negotiated a contract clause in the actual employment letter with new company Lindahl Reed, Inc company **to be guaranteed** a two months severance if Debtors abruptly terminated (for or no cause) before 6 months, one minimum of one month pay if Debtor is terminated at or before 12 months of employment (year probation mark). Debtor proactively tracked performance, including results, Debtor secured grant funding of $100K, and provided other consulting services, and Debtor made sure to disclose to managers, colleagues, employer and government client, that Debtor is involved in a foreclosure lawsuit as a result of previous termination without severance pay to proactively mitigate adverse impacts. Debtor asked for advanced notice of employment termination and honoring of the contractual severance terms to ensure mortgage is paid from the company (Hough, Pappas, Lippert, Matthews), and Client(USACE AL). Yet, this time again

without notice, the employer again attempted to discontinue employment abruptly when Debtor explained that Debtor is on a 3-day sick leave followed by a doctor's visit. On route to a pre-scheduled doctor's appointment, Debtor was hit by a semi-truck that fled the scene and in the hospital 18 March 2024, inside the emergency room, Debtor kept receiving emails to attend a meeting with the employer who ignored the emergency and accident notice. Debtor was in emergency care when employer hired an Attorney to deny liability for any support for the car accident and sent a 10-page Cease and Desist letter to Debtor's family law attorney The employer neglected the health and safety basic requirements of the Debtor. Within weeks of arriving back home and recovering, Debtor returned equipment, communicated with the clients with the help of Debtor's attorney and filed a complaint with DOL, Debtor attempted to reasonably negotiate support for the severance pay so she can cure mortgage arrearages and have more leftover money for doctor care, Debtor spent over $300 on postal mailing letters and returning equipment, and closing work without reimbursements. Since the Volvo semi-truck fled the scene and the car insurance of the Debtor was lower cost to meet strict budget standards of the bankruptcy expenses schedules as per advice of Trustee and Attorney, Debtor's own insurance Progressive denied liability to pay in excess of basic $10,000 PIP (paid directly to hospital) any car collision and comprehensive pay out for any car expenses. Debtor spent her savings from a year's work meeting bankruptcy requirements. Debtor motions the Court to allow US Trustee Support where Debtor reached out with this request.

Very Respectfully,

Ally Dzelilovic

PROOF OF SERVICE

A true and correct copy of the foregoing has been sent by either electronic transmission or U.S. Mail to relevant Case parties on __25 April 2025_____ to:____Ms. Kelly Remick U.S. Trustee, _____;

/s/

Ally A. Dzelilovic
1085 82nd TER N Unit B
St. Petersburg, FL, 33702
ally.a.dzelilovic@gmail.com, Tel: 727.739.4732



**Gmail**

Ally Davis <davis.a.ally@gmail.com>

---

**Potential Cyber Incident Reporting - 05 JUL 24, 1727 ET**
1 message

Ally Davis <davis.a.ally@gmail.com>  
To: DC3.DCISE@us.af.mil  
Cc: osd.dibcsia@mail.mil

Sat, Jul 6, 2024 at 1:00 PM

*[Handwritten note: "DoD Due process for hard drive"]*

To:
Contact DoD Cyber Crime Center
(DC3.DCISE@us.af.mil)
Hotline: (410) 981-0104 Toll Free: (877) 838-2174

From:
Ally A. Dzelilovic-Davis
1085 82nd TER N Unit B,
St. Petersburg, FL, 33702

Good afternoon,

This email serves to report a potential cyber or data vulnerability incident which I was unable to proceed with the reporting route of having a Medium Assurance Certificate to then authenticate and report through the portal. In lieu, I am opting for reporting via this email, and a follow up phone call to the HOTLINE number available: (410) 981-0104.

**Incident Description:**
On or around early February 2024, when I was a contract company employee at the US Army Corps of Engineers, Center of Excellence in Huntsville Alabama, the institution was in the process of changing (upgrading buildings), and between Aug 2023 and Feb 2024 we were asked to pack personal and office belongings take them home and then return them to new site. Upon arrival at the new site my colleague Michael Couch helped me bring up the box of belongings which was heavy to pull up myself, and I placed it on my desk for a few days. After a few days I unpacked the box and found all my items, all GFE and IT equipment belonging to USACE, but also an item which I was close to 100% sure was not mine and I had not packed it in the box in August 2023 when departing the old facility. This was a **hard-drive (black color similar to picture example, Exhibit 1)**. Saving data on external hard-drives is not prohibited based on CUI information safeguarding procedures but the presence of an unknown hard-drive with no instructions from DOD leadership, or management on how to use it **could be mis-used which is why I am writing an incident report.**
My colleague Michael Couch (whose desk was across from mine), asked if it was mine, I explained it was not and that I was close to 100% sure I didn't pack it. I walked over to the office of Mr. John Truddell, Program Manager for the Resource Efficiency Program and other duties in the Energy Division Department and reported this issue. He stated that it was possible I did not remember packing it or that we sometimes forget. I expressed doubt and confirmed I doubted it belonged to me but I confirmed I wanted to let him know of the finding.

I left the hard drive on my desk thinking that maybe management or leadership would come back to me explaining more details or that there was a future assignment associated with safeguarding the data which would require the external hard-drive's future use. However, during the weeks that followed, I did not receive any information on the above.

**Estimated Threat Level:** Mild to Moderate

**Location of Incident:** Previous building 475 Quality Circle, USACE CoE, Huntsville, AL, New address (since Feb 24) RG300 USACE CoE, Redstone Arsenal,

**GOV DOD Personnel notified:**
US. Army Corps of Engineers, Center of Excellence, Huntsville Alabama

**Contractors:**
Lindahl Reed, Inc. but not informed by me of the incident.

**Challenges in communications with Contractors for reporting of incident:**
The week of March 10-14, I contacted the contract company to ask if I could get my clearance transferred from previous contract company to Lindahl Reed Inc. and was informed by FSO and HR (Epiphany Moon and Janice Pappas), that my current contract assignment didn't necessitate "picking up the clearance". Colleague Michael Couch who worked on the same contract stated they picked up his clearance knowing he works on the same exact contract assignment as me. I expressed concern to HR and FSO stating I believed a discriminatory treatment occurred because Michael was able to transfer his. Two days after asserting my right to equal treatment the company fired me while I was on a sick day (March 14). My personal belongings and everything at my desk were on the work site since evening 13 MAR 24. On Monday march 18, I was driving to my doctor's appointment when on the highway back in my home state, I was hit by a semi-truck and injured in a roll-over very serious car accident with a totaled car vehicle. I spent all of March, April and early May recovering from the accident while my personal belongings were stranded on site.

Two days after my car accident knowing I was in the ER, the contract company sent me a cease and desist letter and hired an attorney instead of providing support in this life threatening situation. Even though reporting requires 30 days of date of discovery or issue, I did not make the connection that this could be an incident until after my termination, and since the car accident required immediate medical care, I reported in writing to USACE as soon as I could.

**Reporting Process and Rational:**
That standard procedure would have called for me to report this issue to the contract company FSO (Epiphany Moon) and explain the situation. However, since the issues of discrimination on clearance and labor rights warranted discontinuing communication to deal with them, I could not have a safe or impartial line of communication to report this incident and have not received response nor instructions from USACE CoE ESPC UESC Branch to whom I reported directly.
It was important to this situation despite labor issues with the contract company so I proceeded to inform the DOD client (attached).

First I let IT know (Exhibit 2a), then I let my previous supervisor Mr. Dale Adkins and Branch Chief M. Lazaro, and copy the Safety Department (Exhibit 2b). I have not heard anything back in writing via email, nor phone calls, nor postal mail.

On 04 JUN 2024, 12 boxes with my belongings were shipped to the Office of Jon Hackworth Law, Esq. and we opened on 12 JUN 2024. During discovery, we found **no hard-drive present** in the boxes shipped from Alabama to Tampa, FL, and I completed a SWORN Affidavit in a Court of Law with my law office documenting that the two boxes that arrived in Tampa, FL had no hard-drive in them.
Due to labor (DOL) and EEOC related issues, including possible discrimination, tort, entrapment, an attorney has represented me in communications with the contract company (Lindahl Reed Inc). The involvement of the attorney is not relevant to the work of the DOD Cyber crime unit, but the above incident needed to be reported to you since labor and EEOC laws cannot address it nor can the attorneys. Hackworth law is only involved in DOD matters as it would be appropriate to report via DOD channels issues of such nature. The offices of Jon Hackworth Law, Esq. in Tampa are aware of this hard-drive issue and previewed to all communication. Since the hardware and software cyber challenges do no involve DOL and EEOC issues with contract company but the DOD and federal agency staff reporting procedures and any data or cyber situation is in DOD DIB CS jurisdiction, I am hereby documenting this incident which may or may not require follow up depending on the judgement and decision of the DOD Cyber Crime Center.

However, the mysterious presence of this hard-drive leaves my questions unanswered, and the only individuals who could clarify more at the ESPC UESC Branch and Energy Division at USACE CoE. Michael Couch, my colleague against whom I raised issues of safety due to stalking on site, was the only individual in touch with the contract company who may or may not have shared further information or taken. The USACE agency may have already taken appropriate steps to resolve this matter, I simply do not have any information.
    It's our duty as contractors and DOD staff to report any matters that pertain to safeguarding DOD data or suspicions of possible data breaches. This is the intent behind my Incident Report hereby documented in this email as per latest guidance in 32 CFR 236 reporting extended to ALL CONTRACTORS (Exhibit 3).

If you have any additional questions or need to speak with me regarding the above situation. Please contact me at 727.739.4732 or davis.a.ally@gmail.com, or Hackworth Law, Jon Hackworth at jhack@bhtampa.com

Thank you,

V/R,
Ally Dzelilovic-Davis

-----------------Exhibits-----------------------------

Exhibit 1



Exhibit 2 a and b
See emails attached entitled "USACE Reporting a, and b."

Exhibit 4

7/5/24, 4:21 PM                                    Defense Industrial Base (DIB) Cybersecurity Portal

An official website of the United States government
Here's how you know

### Revision to 32 CFR Part 236 and DIB CS Program Eligibility

On March 12, 2024, revisions to 32 CFR § 236, "Department of Defense (DoD) Defense Industrial Base (DIB) Cybersecurity (CS) Activities" were published in the Federal Register as a Final Rule, to be made effective April 11, 2024. The Final Rule expands eligibility for the DIB CS Program from only contractors that possess an active Facility Clearance to all defense contractors who own or operate an unclassified information system that processes, stores, or transmits Controlled Unclassified Information (CUI).

Read More: https://www.federalregister.gov/documents/2024/03/12/2024-04752/department-of-defense-dod-defense-industrial-base-dib-cybersecurity-cs-activities

2 attachments

📄 Exhibit 2 - USACE Reporting a.pdf
   166K

📄 Exhibit 2 - USACE Reporting b.pdf
   99K

Exhibit 1C


# FEMA

| | |
|---|---|
| Deanne Criswell<br>Administrator<br>Federal Emergency Management Agency | Ron DeSantis<br>Governor<br>State of Florida |
| FEMA<br>P.O. Box 10055<br>Hyattsville, MD 20782-8055 | Date: 10/13/2024 |

Disaster Number: 4834
FEMA Application Number: 635344773

Ally A Dzelilovic
1085 82nd Ter N Unit B
Saint Petersburg, FL 33702

Ally A Dzelilovic:

Thank you for your recent application for FEMA disaster assistance. Attached is a copy of your application. Please review it to make sure the information is correct. Your FEMA application number is located at the top of this letter. You will use this number any time you contact FEMA or send documentation.

If you speak a language other than English and need help with this document, please call 1-800-621-3362. You will be connected to an interpreter who will assist you for free.

Si habla un idioma diferente al inglés y necesita ayuda con este documento, llame al 1-800-621-3362 y lo conectaremos con un intérprete que lo ayudará sin costo alguno para usted.

Если вы не говорите на английском языке и нуждаетесь в помощи, позвоните по номеру 1-800-621-3362. Вас соединят с переводчиком, который бесплатно поможет вам.

Se você fala um idioma além do inglês e precisa de ajuda em relação a este documento, ligue para 1-800-621-3362 e você será conectado a um intérprete que irá ajudá-lo sem nenhum custo adicional.

Nếu quý vị nói một ngôn ngữ khác Tiếng Anh và cần giúp đỡ với tài liệu này, hãy gọi 1-800-621-3362 và quý vị sẽ được kết nối với một thông dịch viên, là người sẽ trợ giúp miễn phí cho quý vị.

영어를 사용하지 못하는 사람으로써 본 문서에 대해 도움이 필요할 경우, 전화 1-800-621-3362 로 연락주시면 여러분을 무료로 도와줄 통역사와 연결해 드립니다.

---

**An Introduction to FEMA's Individuals and Households Program (IHP)**

FEMA may provide money and other services to help you recover from losses (like damage to your home, car, and other personal items) caused by a Presidentially declared disaster. FEMA can't provide assistance for losses that may be covered by your insurance or for any losses you've already got money or services for. This may include assistance from a community group or volunteer organization.

FEMA is limited by law to how much money we can provide, and it is unlikely that our assistance will cover all of your losses. We are here to guide and help with *your* unique needs.

Please keep this letter so you can refer to it later. It contains important information about disaster assistance that may be available to you.

| |
|---|
| The Individuals and Households Program (IHP) offers different types of assistance in **bold** below. |
| ➢ **Housing Assistance**: This assistance is money to help you with expenses not covered by insurance. |

This may include:
- **Rental Assistance**: Money you can use to rent a home, apartment, or other type of housing if you can't live in your home because of the disaster. FEMA may provide this assistance for up to 18 months from the disaster declaration date of 10/11/2024.
- **Lodging Expense Reimbursement**: Money to reimburse you for emergency lodging (such as hotel or motel) expenses if the disaster caused you to temporarily leave your home and you didn't receive Displacement Assistance.
- **Home Repair or Replacement Assistance**: Money to help you repair or replace your disaster-damaged home, which may include existing issues that were made worse by the disaster or cleaning mold. FEMA can only provide this assistance if you are a homeowner, are responsible for the taxes or maintenance of the home, or have a lifetime right to live in the home.
- **Assistance for Accessibility Real Property Needs**: If you or a member of your household has a disability, FEMA may offer additional money for specific repairs to help make your home accessible. This may include an exterior ramp, grab bars, or a paved path to home entrance. This money may also help you add these accessibility items to your home even if your home didn't have them before the disaster. FEMA can only provide this assistance if you are a homeowner, are responsible for the taxes or maintenance of the home, or have a lifetime right to live in the home.
    - If you or a member of your household has a disability and needs an exterior ramp, grab bars, or a paved path, please contact FEMA's Helpline at 1-800-621-3362.

> **Other Needs Assistance**: This assistance is money to help you with other necessary disaster-caused expenses and serious needs. This assistance is available to homeowners, those who are responsible for the taxes or maintenance of the home, or have a lifetime right to live in the house, and renters.

This may include:
- **Serious Needs Assistance**: Money to help you pay for immediate expenses for sheltering, evacuation, and meeting basic household needs because of the disaster. The money may be used for items like food, water, infant formula, breastfeeding equipment, diapers, hygiene products, and other basic needs.
- **Displacement Assistance**: Money to help you pay for short-term living arrangements you need because of the disaster. Like hotels, motels, friends and family, or other available short-term living options immediately following a disaster.
- **Personal Property Assistance**: Money to help you repair or replace disaster-damaged appliances (like a stove and refrigerator), room furnishings (like a bed, sofa, and chairs), and essential items required for employment or school (like job-related tools, uniforms, and schoolbooks).
- **Assistance for Accessibility-related Personal Property Needs**: Money for personal property like a walker, or wheelchair.
- **Transportation Assistance**: Money to help you repair or replace a disaster-damaged vehicle when you don't have another vehicle you can use.
- **Moving and Storage Assistance**: Money to help you move and store personal property from your home. This helps prevent additional damage while you're making repairs to your home. This money can also help with moving to a new place due to the disaster.
- **Medical Assistance**: Money to help you pay for expenses because the disaster caused an injury or illness. You can also use this money to replace disaster-damaged or lost medical equipment, breastfeeding equipment, or prescription medicine.
- **Dental Assistance**: Money to help you pay for disaster-caused dental expenses.
- **Funeral Assistance**: Money to help you pay for disaster-caused funeral or reburial expenses.
- **Child Care Assistance**: Money to help you pay for new disaster-caused child care expenses. This money may also help with increased child care expenses.
- **Assistance for Other Items**: Money to pay for specific items to help access your property or with cleaning efforts. (Like a generator, dehumidifier, chainsaw, etc. bought or rented after the disaster.)
- **Group Flood Insurance Policy**: If your home is located in a Special Flood Hazard Area and you have disaster-caused flood damage, FEMA may buy a Group Flood Insurance Policy (GFIP) for you. This gives you 3 years of coverage.
- If FEMA buys a GFIP for you, FEMA will send you a letter with more information. To learn more, please call 1-800-638-6620 or visit www.FloodSmart.gov.
- **Clean and Sanitize Assistance**: *This assistance is only available in certain disasters.* This money is to pay for minor disaster damage to prevent potential health or safety concerns. (Like one broken window or wet carpet near your door.)

**How to Qualify for FEMA Assistance**